DAUGHERTY, Plaintiff, vs. HERTE and wife, Defendants.
[Two appeals.]

*October 21—December 18, 1946.*

544

*B. F. Saltzstein* and *Howard G. Brown,* attorneys, and *Joseph P. Brazy* of counsel, all of Milwaukee, for the plaintiff.

For the defendants there was a brief by *Gold & McCann* of Milwaukee, and oral argument by *Ray T. McCann.*

FAIRCHILD, J.   The trial court extended the time within which to serve the proposed bill of exceptions.   Sec. 269.45, Stats.   The extension was not formally asked for until shortly after the time for service of the bill had expired.   This was because the attorney mistakenly thought an *ex parte* application would suffice.   The delay caused was too slight to cause any

resulting disadvantage to the opposite party. The appeal was taken promptly, the transcript as promptly secured. It seems quite clear that sufficient testimony showing good cause for an extension existed. A review of the affidavits and testimony on the hearing to show cause shows the mistake of counsel as to the effectiveness of an *ex parte* order extending the time, the engagement of counsel in other matters, and the adequate expediting of the appeal together with the shortage of stenographic help. We are satisfied from this review that the court was well within its discretion in granting the order. Serious delays may discredit the good faith of the application and materially weaken the evidence in support of such an application, but no such condition exists here. Upon the facts presented and on the whole record the court was warranted in finding good cause existed for the extension.

As to the merits, Daugherty desired to acquire the business of Browning, King & Company, a corporation. His plan was to purchase stock from certain stockholders from whom he had secured options. He needed money for the purchase of the stock and asked Herte for help. Herte was willing to make necessary advances. In providing the means by which Daugherty could accomplish his purpose, the agreement set forth in the preceding statement of facts was entered into. Herte later attempted to modify the original arrangement, at least so far as management and control of the business is concerned, by securing control for himself of more than one half of the stock. This attempt, as will appear later, lacked validity due to the misrepresentation and deceit used by him. It resulted only in acts affecting Daugherty's right of dissolving the relationship.

Under the original agreement, which was made on March 9, 1945, the shares of stock were to be taken in Daugherty's name except for one qualifying share to Herte and one to Mrs. Herte and another to Mrs. Daugherty. The corporation was to remain in full force and vigor for the period of time out-

lined in the agreement.  On March 13, 1945, the Daughertys and the Hertes were made officers of the corporation as follows: Daugherty, president; Mrs. Daugherty, first vice-president; Mrs. Herte, second vice-president; and Herte, secretary-treasurer.  The parties agreed to purchase the remaining outstanding shares of Browning, King & Company stock.  Accordingly, on March 30, 1945, Daugherty purchased an additional twenty shares of stock at a price satisfactory to Herte.  This left ten shares of the company's stock in other hands.  They were held by one Faust, with whom both Daugherty and Herte unsuccessfully negotiated during the summer and fall of 1945 in an effort to buy.  When all outstanding stock could be and had been purchased by the coadventurers, the corporation was to be dissolved and a partnership with Daugherty and Herte as equal partners was to come into being.  This partnership was to last for ten years, and then the business on payment to Herte of the value of his interest, was to pass to Daugherty.  During the existence of the corporation, Daugherty, who is the one experienced in the business, was to be in control.  From March 13th on he took charge of the business as general manager.  He was the one in whose name the bank loan was made and to whose name all shares except the qualifying ones for the Hertes were originally transferred.  Herte was protected by a provision in the contract for an assignment of stock as security.  The parties agreed "at all times, whether stockholders of Browning, King & Company, or partners, as successors to Browning, King & Company to share equally as joint owners of initial or future interests."  Daugherty was to be paid a salary immediately upon his stepping into the operation of the business and Herte was to receive reasonable compensation in the event substantial services were required of him; all profits were to be divided equally.

The relationship of the parties to each other, established by the original contract, is that of coadventurers.  Daugherty's

contribution was his control of options governing a controlling block of the Browning, King & Company stock. The contribution of Herte was cash to enable Daugherty to complete the control and initially to finance and advance the enterprise. The adventure was of limited duration, and the plain purpose was for Daugherty ultimately to become the owner of the business, Herte being compensated by the profits specified to go to him in the original contract. While the adventure was one involving a particular corporation, and the relations of the parties were in some measure regulated by their status as stockholders and the general laws governing a corporation, it was of the essence of this contract that ultimately Daugherty was to acquire and Herte was to relinquish the subject matter of the adventure. Any act on the part of either Daugherty or Herte which rendered impossible that objective or indicated an abandonment of it, is necessarily an essential breach and an offer to the other party to bring matters to a conclusion.

There is evidence indicating that during the summer and fall of 1945, Daugherty charged the company for such items as clothes, tobacco, hotel bills, flowers, and liquor which he gave to others. The trial court found that he breached the contract when he charged personal vacation expenses at Lake Delavan and $20 for theater tickets in New York to the company's account. These acts of Daugherty were considered by the trial court as breaches of the contract. They should have been treated as fundamentally violations of his duty to the corporation. If the expenditures complained of were really the result of an effort on the part of Daugherty to meet the difficulties arising out of market conditions causing a shortage of goods and an effort to overcome to some extent the exigencies of that market which seriously interfered with securing supplies for customers, then they at most were breaches of good judgment in handling corporate funds. The items referred to by the trial court and other items such as traveling expenses were entered upon the books of the company. An accounting for

the purpose of recapturing these moneys, if not proper expenditures, from his salary would in every instance have kept the corporation whole. And then in no way would any of his acts render impossible the attaining of the objects of the enterprise. Those acts do not indicate a purpose to abandon the contract. Further reference to these items and the findings of the court regarding them will be made later.

However, Herte's conduct, as he alleges, after learning of Daugherty's use of money and his method of entering the items on the books, indicates Herte's purpose to end the coadventure. He determined to ignore the terms of the contract, to act outside thereof, and in a manner calculated to enable him to take over the enterprise for himself. We therefore are primarily concerned with the effect upon Herte's standing with relation to the continuance of the original agreement because of the finding by the trial court that he committed a material and substantial breach of the joint-adventure contract by secretly inducing a friend of his to purchase the last block of stock and by artfully securing from Daugherty enough more stock to enable him to gain control of the venture. The evidence sustains the finding and warrants the conclusion reached by the trial court so far as that phase of the matter is concerned. Herte did this deceitfully. On October 16, 1945, Herte, without the knowledge of Daugherty, arranged a purchase of the Faust stock by one Fred Rathkamp. On October 23, 1945, at Herte's suggestion, the eighty-nine shares previously acquired were divided equally between the Daughertys and the Hertes.

The purchase of the Faust stock had been a matter of concern to both Daugherty and Herte about which they had conferred. The secrecy accompanying the transaction on the part of Herte indicates the intention on his part of circumventing the accomplishment of the objective provided for in the original contract. He secretly got control of the Faust stock. He concealed this fact from Daugherty and represented to Daugherty that an equal ownership in the presently held stock

would further the enterprise by straightening out the coadventurers' relation to each other. He brought about the adjustment of stock he desired and caused, on October 23, 1945, the recording of forty-four and one-half shares of stock in the name of the Daughertys and the other forty-four and one-half shares in his and his wife's name. The transfer of shares from Faust to Rathkamp on October 16, 1945, was not shown on the books of the company until November 16, 1945, when the Daughertys were absent from the city and the new stock certificate was issued by Mrs. Herte as second vice-president. Daugherty first learned of that transaction after he began his action seeking specific performance of the contract. The information came during the course of an adverse examination of Herte in December, 1945.

This transfer of stock from Daugherty to Herte gave him absolute control of the corporation, which control he proceeded to use in furtherance of his plan. On November 19, 1945, Herte called a special meeting of the company's board of directors for November 21st. Daugherty attended the meeting, but Mrs. Daugherty did not. At that meeting Herte presented resolutions charging Daugherty with mismanagement, removing him from office, revoking his authority to sign checks, and electing Herte as general manager with control of the bank accounts. These resolutions were adopted by vote of Herte and Mrs. Herte.

In considering the acts of Herte in comparison to those of Daugherty referred to above, the trial court was of the opinion that, under the "clean-hands doctrine," Daugherty's acts were of such a nature as to preclude him from pressing his complaint for rescission. This doctrine, of course, subjects the acts relied on to a comparison of faults. In *Keilly v. Severson* (1912), 149 Wis. 251, 256, 135 N. W. 875, it was said,—

"It is often, rather illogically, said that a person cannot successfully appeal to a court of equity unless he, himself, is without fault. If that were literally true, great wrongs, cognizable

only in that jurisdiction [equity], would go unredressed because of the victim being guilty of some fault of insignificant character as compared with that of his adversary."

Also see *E. L. Husting v. Coca Cola Co.* (1931) 205 Wis. 356, 374, 237 N. W. 85.

The acts of Daugherty with relation to corporate accounts did not go to the root of the contract. The items were entered upon the books of the corporation and the methods followed do not sustain a charge of fraud or artifice. Herte, who was secretary-treasurer of the corporation as well as a joint adventurer, under the original contract possessed ample means of protecting himself and the corporation against loss from bad practices or selfish designs if that is what they were. Daugherty's acts at most fall in the field of partial failure, and for partial derelictions and nonperformance in matters not necessarily of first importance to the accomplishment of the object of the joint-adventure contract, the party claiming to be injured ought to seek his remedy upon the stipulations of the contract itself.

Daugherty's defaults, as affecting the joint adventure, when compared to those of Herte are both qualitatively and quantitatively incapable of destroying the objects aimed at in the contract. They do not approach in result or purposes which may be ascribed to them, those of Herte. Herte's conduct resulted in a breach tainted by deception and artifice, destroying the relation of joint adventurers. He was guilty of a direct effort to circumvent the joint adventure and the terms of the contract. It may be that Herte tired of the arrangement because of Daugherty's way of managing the business, although the evidence with unmistakable clearness shows a motive on Herte's part, not to protect his interests under the contract, but to eject Daugherty from management and to acquire the business and bring unto himself the things jointly undertaken to be acquired for Daugherty. His secretly getting control of the Faust stock and, after having Daugherty

transfer additional shares, then voting this stock to expel Daugherty from his place in the management of the corporation, not only breached the original agreement by making its objectives impossible to realize but indicated his purpose to abandon the joint adventure.

Before Herte's plan became known and its full significance was made to appear, Daugherty in an attempt to regain his position and preserve his rights began an action for specific performance. While that action was pending, an adverse examination of Herte brought to light the fact that he had secretly acquired enough additional stock when added to the shares secured from Daugherty on October 23, 1945, to displace Daugherty entirely. Upon disclosure of these facts, the complaint was amended to demand judgment rescinding the contract of March 9th. The amended complaint also prayed for such other and further relief as may be just and equitable. Since this case involves, not the ordinary contract, but a joint-adventure agreement from which a series of transactions grew, the relief sought by the plaintiff would be more accurately displayed by thinking of it as dissolution of the joint adventure rather than rescission. While this may seem a transition from one form of relief to another, the same principles of equity are to guide us so that there may be an adaptation of the decree to the particular circumstances which appear. A court of equity may "model the remedy, so as to suit it to mutual and adverse claims, controlling equities, and the real and substantial rights of all the parties." Story, Eq. Jur. (Redfield's edition), p. 21, sec. 28; Pomeroy, Eq. Jur. (4th ed.) sec. 181; *Meyer v. Reif* (1935), 217 Wis. 11, 20, 258 N. W. 391.

The conduct of one party in abandoning a contract justifies the other party in electing to end the relationship. When one party so decidedly repudiates a contract as to indicate an intention to no longer be bound by it, the other party is authorized to renounce the contract. *Drake v. Goree,* 22 Ala. 409; *McAllister-Coman Co. v. Matthews,* 167 Ala. 361, 364, 52 So.

416, 417; *Lake Shore & Michigan Southern Railway Co. v. Richards,* 152 Ill. 59, 38 N. E. 773, 30 L. R. A. 30, 53, 59; Black, Rescission and Cancellation, p. 8, sec. 6.

This principle has frequently been applied to cases involving coadventure and partnership agreements or contracts. The serious misconduct of one coadventurer in matters relating to the venture is ground for dissolving the relationship. In *Thompson v. Duncan* (1932), 44 S. W. (2d) 904, 907, it is said:

"While a court of equity will not dissolve a joint adventure for slight or trivial dereliction upon the part of one of the members, yet it will dissolve the same for such misconduct upon the part of a coventurer as would justify the dissolution of a partnership."

It is well recognized that conduct by one partner which amounts to a wilful breach of the partnership agreement justifies dissolution. In *Dow v. Beals* (1933), 149 Misc. 631, 632, 268 N. Y. Supp. 425, a partnership was dissolved for a reason similar to one that appears here. In that case a corporation was used to carry out a partnership agreement, and the court said:

"The actions of the defendants . . . in excluding the plaintiff from any participation in the conduct of the defendant corporation, constituted a violation of the copartnership agreement, and the plaintiff is entitled to have the copartnership dissolved and to an accounting among these partners."

An English case, *In re Davis and Collett, Ltd.* (1935) 1 Ch. (Eng.) 693, presents another situation closely analogous to the one at bar. In that case the capital of a private company was so owned as to make the company in substance a partnership, and one of the directors acquired complete control of the company by irregularities in the conduct of board meetings and the distribution of shares. There the court said:

"I have come to the conclusion in this case that, in effect, the object of the meetings . . . was to get sufficient power in the

respondent's hands to enable the respondent to get himself appointed managing director and thereby obtain complete control of the company. . . . What weighs with me very much is that I find the next step he takes is to eject the petitioner . . . treating him as a person who was to have no further part in the management of the company, though he was in fact a director. Looking at the matter all round and considering the evidence as a whole, I cannot help coming to the conclusion that this is a case where it is just and equitable that the company should be wound up." (p. 702.) See 30 Am. Jur., Joint Adventures, p. 703, sec. 49, 118 A. L. R. 1421.

The trial court's ruling that the effect of Daugherty's acts required denying him any relief was error. It is an over-extension of the doctrine of clean hands. That doctrine never was intended to be a shield for wrongdoing. It does not require a denial of hearing to Daugherty under the circumstances present, which denial would enable his opponent by any and all ruthless efforts completely to appropriate an enterprise with which he would have had no connection but for his hired assistance. While Daugherty's acts, given their full weight under the contract, do not amount to more than acts inconsistent with the contract, Herte's were inconsistent with the intention to be longer bound by the contract. It is considered that the conduct of Herte clearly gave Daugherty a right to seek relief in equity looking for a conclusion and adjustment of the matters arising out of the coadventure, subject to putting Herte in the position that under all conditions will be equitable.

The cause must be returned for further proceedings which will place the parties in the position they by their acts have determined to occupy and for an accounting based upon a dissolution of the joint-adventure contract as of November 21, 1945. The respondent will be granted a return of money and such profits, if any, as have accrued up to that time. Upon the payment of the amount advanced and profit found due to Herte and his release from liability in connection with the business,

he is required to transfer to Daugherty the forty-four and one-half shares of stock acquired by him through Daugherty.

*By the Court.*—Order extending time for service of bill of exceptions affirmed. Judgment reversed. Cause remanded for further proceedings in accordance with this opinion.